**Daniel J. DONOVAN, Plaintiff,**

v.

**Evert FOWLE, et al., Defendants.**

**No. 1:09–cv–00328–JAW.**

United States District Court, D. Maine.

Jan. 20, 2011.

Daniel J. Donovan, Readfield, ME, pro se.

William R. Fisher, Attorney General's Office, Augusta, ME, for Defendants.

## ORDER AFFIRMING THE RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

JOHN A. WOODCOCK, JR., Chief Judge.

The Court affirms the Magistrate Judge's Recommended Decision and concludes that the Plaintiff's lawsuit against his former prosecutors is barred by the doctrine of prosecutorial immunity.

## I. STATEMENT OF FACTS

### A. Procedural History

On July 28, 2009, Daniel J. Donovan filed a civil rights complaint against Evert Fowle, the District Attorney for Kennebec County, Alan Kelley, an Assistant District Attorney, and Paul Rucha, another Assistant District Attorney (collectively State Defendants).[1] *Compl.* (Docket # 1). On March 19, 2010, the State Defendants moved for summary judgment. *Mot. for Summ. J. by Defs. Evert Fowle, Alan Kelley, and Paul Rucha* (Docket # 35) (*State Defs' Mot*). The resolution of the motion was delayed by a dispute about whether Mr. Donovan was entitled to further discovery; on May 10, 2010, Mr. Donovan responded to the State Defendants' motion. *Opp'n to Mot. for Summ. J. by Defs. Evert Fowle, Alan Kelley, and Paul Rucha* (Docket # 52) (*Pl.'s Opp'n.*). On May 24, 2010, the State Defendants replied. *Reply to Pl.'s Ob. to Defs' Mot. for Summ.*

---

1. Mr. Donovan initially spelled Mr. Fowle's first name as Everett but on August 21, 2009, the Defendants moved to correct the spelling. *Mot. to Correct Spelling in Caption by Defs.* *Evert Fowle, Alan Kelley, and Paul Rucha* (Docket # 10). The Court granted the motion on August 24, 2009. *Order* (Docket # 11).

*J. by Defs. Evert Fowle, Alan Kelley, and Paul Rucha* (Docket # 62).

On August 9, 2010, the Magistrate Judge issued a Recommended Decision. *Recommended Decision* (Docket # 64). Mr. Donovan objected on September 8, 2010 and the State Defendants responded on September 23, 2010. *Ob. to the Recommended Decision* (Docket # 67); *Resp. to Pl.'s Ob. to Recommended Decision by Defs. District Att'y Evert Fowle, Deputy District Att'y Alan Kelley, and Assistant District Att'y Paul Rucha* (Docket # 69) (*State Defs.' Resp. to Pl.'s Ob to Recommended Decision*).

**B. Mr. Donovan's Complaint**

In his July 28, 2009 Complaint, Mr. Donovan says that on February 6, 1996, he was convicted of gross sexual assault and on May 8, 2006, he received a twenty year sentence, all but fifteen years suspended and six years probation. *Compl.* ¶¶ 10–11. As a consequence of his conviction and sentence, Mr. Donovan was incarcerated in Maine Department of Corrections (MDOC) facilities from at least September 1995 to December 28, 2004. *Compl.* ¶ 5. He alleges that at the time he filed the Complaint, he was on state probation and was scheduled to remain on state probation for about two years. *Id.* Mr. Donovan says that because of his conviction, he is subject to lifetime registration as a sex offender. *Id.* As a lifetime sex offender, Mr. Donovan is required not only to maintain his registration, but also to pay registration fees and for a passport photograph each time he re-registers. *Id.* ¶ 23. Mr. Donovan asserts that he was actually innocent of the crime of gross sexual assault and he is seeking an order, requiring the state to hold an evidentiary hearing to allow him the opportunity to "make a conclusive showing of actual innocence." *Id.* ¶ 47. He says that by denying him a right to a hearing, the State Defendants are violating his rights to due process and other rights under both the United States and Maine constitutions. *Id.* ¶¶ 49, 73–74. Mr. Donovan seeks an injunction that would prohibit the State Defendants from interfering with his right to a hearing and he asks for a hearing in this Court concerning the alleged deprivation of his constitutional rights. *Id.* ¶ 75.

**C. The State Defendants' Summary Judgment Motion**

The State Defendants moved for summary judgment on a number of grounds: 1) the Donovan lawsuit is barred by the *Rooker–Feldman* doctrine; 2) the Donovan lawsuit is barred by *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); 3) the Donovan lawsuit does not state a cognizable basis for his desired relief; 4) the Donovan lawsuit does not allege that the Defendants engaged in prosecutorial misconduct that could form the basis for a § 1983 claim; 5) the Donovan lawsuit attempts to plead a case against the state of Maine and the state is not subject to suit under § 1983; 6) the Donovan lawsuit's claims under the Maine constitution are not cognizable under § 1983; 7) the Donovan lawsuit is barred by the doctrine of *res judicata;* 8) Mr. Donovan has no evidence to support his claim for relief; and, 9) Mr. Donovan is not entitled to punitive damages against state officials. *State Defs.' Mot.*

**D. Mr. Donovan Responds**

In his Response, Mr. Donovan relates the history of his case from an Order by Justice Donald Alexander dated June 10, 1997 through his appeals and the Superior Court dispositions of his demands that the state perform DNA testing. *Pl.'s Opp'n* at 1–6. Mr. Donovan stresses that he is not seeking to have his conviction vacated or for redress for damages caused by the

state courts; instead, he seeks redress for harm that the named defendants have caused him by standing between him and his desired evidentiary hearing. *Id.* at 6. He then disputes each of the State Defendants' contentions. *Id.* at 12–23.

### E. The Recommended Decision

On August 9, 2010, the Magistrate Judge issued a Recommended Decision in which she recommended that the Court grant the State Defendants' motion for summary judgment. *Recommended Decision* at 15. The Magistrate Judge concluded that Mr. Donovan's case is not barred by the *Rooker–Feldman* doctrine. *Id.* at 8–11. She therefore reached the merits of his claim. The Magistrate Judge then turned to whether the State Defendants, all prosecutors, are entitled to prosecutorial immunity. *Id.* at 11–15. She concluded that they are because all of the alleged violations pertain to duties "performed pursuant to the prosecutors' roles as advocates." ' *Id.* at 13. She recommended the motion for summary judgment be granted on that basis. *Id.* at 11–15.

### F. Mr. Donovan's Objection

On September 8, 2010, Mr. Donovan objected to the Magistrate Judge's Recommended Decision. *Ob. to the Recommended Decision.* He contends that the Magistrate Judge's rationale for granting summary judgment is "extraordinary and outrageous, especially under the U.S. Supreme Court's Decision in *Imbler v. Pachtman,* 423 [424] U.S. 409, 417 [96 S.Ct. 984, 424 U.S. 409] (1976)." *Id.* at 1–2. He says that neither *Imbler* nor *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) "endorse the reliance upon false and/or perjured testimony." *Id.* at 2. He asserts that Defendant Allan Kelley knew throughout his trial that "he had elicited and continually relied on false testimony from former Maine State Police Forensic Chemist, Allison Gingrass." *Id.* He contends that, contrary to the Magistrate Judge's conclusion, Defendant Kelley's actions did not fit within the scope of the prosecutor's advocacy function, but were within the scope of the prosecutor's administrative or investigative functions. *Id.* at 4. He argues that the Magistrate Judge failed to view the evidence in the light most favorable to him. *Id.* at 5–6. Mr. Donovan then recites what he contends is false and misleading testimony that took place during his trial. *Id.* at 8–13. Reiterating that he has "maintained his innocence at every stage of his proceedings", he urges the Court to require the evidentiary hearing he has been seeking. *Id.* at 13.

### G. The State Defendants' Response

First, noting that Mr. Donovan's objection reaches only the conduct of Defendant Alan Kelley and not Defendants Fowle and Rucha, the State Defendants "construe [Mr.] Donovan's Objection to the Recommended Decision as limited to his claims against [Mr.] Kelley alone." *State Defs.' Resp. to Pl.'s Ob to Recommended Decision* at 2.

Turning to Mr. Kelley, the State Defendants assert that Mr. Donovan "has not adduced any evidence tending to show that [Deputy District Attorney] Kelley used, facilitated, or relied upon false testimony from Forensic Chemist Allison Gingrass or any other witness in his criminal trial." *Id.* at 3. The State Defendants point out that Ms. Gingrass found both blood and semen on the remains of a genital swab obtained from the alleged victim but she was unable to determine whether the blood or semen was Mr. Donovan's. *Id.* at 3–4. According to the State Defendants, Mr. Shargo's later testimony did not contradict Ms. Gingrass's. *Id.* at 4. Mr. Shargo

merely said that he found no evidence of semen on what was left of the swab and explained that this was not unusual since he could not test the same sample that Ms. Gingrass had tested. *Id.* The State Defendants contend there is no evidence of false trial testimony. *Id.*

The State Defendants turn to prosecutorial immunity. *Id.* at 4–6. They note that although Mr. Donovan asserts that Assistant District Attorney Kelley's actions fell within the administrative or investigative function, not the advocacy function, the focal point of Mr. Donovan's claim is testimony that Assistant District Attorney Kelley elicited during trial, which is quintessentially advocacy. *Id.* at 5–6.

## II. DISCUSSION

Consistent with its statutory obligation, the Court thoroughly reviewed this case on a de novo basis to determine whether to accept or reject the Magistrate Judge's Recommended Decision. It did so particularly since Mr. Donovan is earnestly claiming that he is actually innocent of the crime for which he has been found guilty and has served time in prison. Despite Mr. Donovan's effort to convince the Court that the Magistrate Judge erred in her Recommended Decision, the Court disagrees.

■ For the reasons well articulated by the Magistrate Judge, Assistant District Attorney Alan Kelley's examination in court of the prosecution's expert witness Allison Gingrass falls well within the scope of prosecutorial immunity for advocacy.[2] Furthermore, Mr. Donovan's assertion that Mr. Kelley procured and continually relied upon false testimony and in doing so, was acting in his administrative or investigative capacity fails. Despite Mr.

Donovan's attempt to distinguish *Imbler,* the facts in *Imbler* are remarkably similar to what Mr. Donovan is claiming here. In *Imbler,* the defendant claimed among other things that the prosecutor allowed an eyewitness to give false identification testimony. *Imbler,* 424 U.S. at 416, 96 S.Ct. 984. The *Imbler* Court noted that there will be cases where a prosecutor functions as an administrator rather than as an officer of the court and it will be necessary to draw "a proper line" between the two, which "may present difficult questions, but this case does not require us to anticipate them." *Id.* at 431 n. 33, 96 S.Ct. 984. Under *Imbler,* Assistant District Attorney Kelley is absolutely immune.

The Court acknowledges that resolving this case on prosecutorial immunity may well leave Mr. Donovan dissatisfied since he will not get the hearing he seeks. But since Mr. Kelley's actions fall squarely within the "judicial phase of the criminal process", he is absolutely immune from civil action. *Van de Kamp v. Goldstein,* 555 U.S. 335, 129 S.Ct. 855, 860, 172 L.Ed.2d 706 (2009) (quoting *Imbler,* 424 U.S. at 430, 96 S.Ct. 984). When a prosecutor's actions are those of an advocate, in the words of the United States Supreme Court, "the immunity that the law grants prosecutors is absolute' ". *Id.*

The Court has made a *de novo* determination of all matters adjudicated by the Magistrate Judge and it concurs with those recommendations for the reasons set forth in her Recommended Decision and for the reasons set forth herein. The Court determines that no further proceeding is necessary.

## III. CONCLUSION

It is therefore ORDERED that the Recommended Decision of the Magistrate

---

**2.** Mr. Donovan has waived any continuing claim against either District Attorney Fowle or Assistant District Attorney Rucha by failing to articulate any objections to the Magistrate Judge's Recommended Decision as regards those two Defendants.

Judge (Docket # 64) is hereby AF-FIRMED and the Court GRANTS the Defendants' Motion for Summary Judgment with respect to their defense of prosecutorial immunity (Docket # 35).

SO ORDERED.

## RECOMMENDED DECISION

MARGARET J. KRAVCHUK, United States Magistrate Judge.

In 1996, Daniel J. Donovan was convicted of gross sexual assault in the Kennebec County Superior Court. He served the imprisonment portion of his sentence but remains on probation and subject to a requirement that he register as a sex offender. Following his conviction, Donovan availed himself of the available means of proving his innocence through post-conviction DNA testing pursuant to a court ordered process. Donovan has now brought suit against the Kennebec County District Attorney and two of his assistants,[1] alleging violations of his constitutional rights in connection with this post-conviction DNA process. Pursuant to 42 U.S.C. § 1983, Donovan seeks declaratory and injunctive relief, and $30,000 in damages. Donovan claims that the three defendants prevented him from obtaining access to an evidentiary hearing in state court at which he could have presented DNA information that would have established his actual innocence. The defendants move for summary judgment on nine separate grounds, including that Donovan's suit is barred by the *Rooker–Feldman* doctrine and that their prosecutorial duties grant them im-

munity from suit. I now recommend that the court grant the defendants' motion for summary judgment.

### Material Facts

The following factual statement is drawn from the parties' competing statements of material facts, filed in accordance with Local Rule 56, and from the record cited in support of those statements. *See Doe v. Solvay Pharms., Inc.,* 350 F.Supp.2d 257, 259–60 (D.Me.2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); *Toomey v. Unum Life Ins. Co.,* 324 F.Supp.2d 220, 221 n. 1 (D.Me.2004) (explaining "the spirit and purpose" of Local Rule 56). The underlying statements are found in the Defendants' Statement of Material Fact in Support of Summary Judgment ("DSMF," Doc. No. 34), the Plaintiffs Response to Statement of Fact with Statement of Additional Facts ("RSF," Doc. No. 53), and the Defendants' Reply Statement ("DRS," Doc. No. 63).

### Donovan's Conviction for Gross Sexual Assault

During the night of June 22, 1994, Donovan, his girlfriend Robyn Reed, and two friends were celebrating Robyn's recent divorce at Donovan's house in Monmouth. *State v. Donovan,* 1997 ME 181, ¶ 2, 698 A.2d 1045, 1046. An incident ensued between Donovan and Reed, described in the Maine Supreme Judicial Court opinion referenced below, which forms the background for this lawsuit.[2] The police ar-

---

1. Evert Fowle is the Kennebec County District Attorney. Alan Kelley is the Kennebec County Deputy District Attorney. Paul Rucha is a Kennebec County Assistant District Attorney.

2. At this point the defendants include additional facts from the Maine Supreme Court opinion that Donovan disputes. I do not find

these facts material to the summary judgment issues, but I will set them forth for background purposes: At one point during the evening, Donovan became angry with Robyn and her friend, Melissa Lowe, and began threatening them. *State v. Donovan,* 1997 ME 181, ¶ 2, 698 A.2d at 1046. As Robyn and Melissa ran from the house, Donovan threw an ashtray at Robyn, striking her in the back.

rested Donovan and took the sweatpants he was wearing for evidentiary purposes. *State v. Donovan*, 2004 ME 81, ¶ 4, 853 A.2d 772, 774. Robyn was taken to the hospital where the underwear and the blanket she was wrapped in were taken to preserve any evidence on them. *Id.* Robyn did not consent to a physical examination during her initial visit to the hospital, but upon her return hours later she was examined and evidence from the examination was preserved. *Id.* Police also took as evidence a used condom found in Donovan's kitchen trash on the evening of June 22, 1994. *Id.*

Deputy District Attorney Alan Kelley prosecuted the State's case against Donovan. (Compl. ¶ 11.) At trial, Donovan argued that he did not have sexual intercourse with Robyn during the morning of June 22, 1994. *State v. Donovan*, 2004 ME 81, ¶ 5, 853 A.2d at 774. Allison Gingrass, a forensic chemist with the Maine State Police Crime Laboratory who analyzed several items of physical evidence, testified about possible identification of the individual who deposited semen found on Robyn's external genitalia during her second hospital visit and in the condom found in Donovan's kitchen trash can. *Id.* Gingrass concluded that at least some part of the mix of blood and semen on a swab containing fluid taken from Robyn's external genitalia belonged to an individual in

*her* blood group. *Id.* Gingrass also testified that in a mixture of fluids a more prevalent fluid could mask others, making it difficult to determine if a different blood group was present. *Id.* Donovan was of a different blood group than Robyn, and no evidence of his blood group was identifiable on the swab. *Id.* Gingrass further testified that the semen in the condom found by the police in Donovan's kitchen trash can came from someone with Donovan's blood group, and that a pubic hair found in the condom was similar to a sample taken from Donovan and dissimilar to a sample taken from Robyn. *Id.* Finally, Gingrass testified that when the condom was used could not be determined. *Id.* Donovan disputes much of Gingrass's testimony. (RSF ¶ 35–36.)

In its closing argument at Donovan's criminal trial, the State referred to Gingrass's analysis, reiterating that Donovan's blood group was consistent with that of the semen in the condom, and argued that Donovan attempted to conceal the condom by throwing it in the trash. *State v. Donovan*, 2004 ME 81, ¶ 8, 853 A.2d at 774. The jury found Donovan guilty of gross sexual assault, assault, criminal mischief, and the violation of a bail condition. *State v. Donovan*, 1997 ME 181, ¶ 1, 698 A.2d at 1046. He was sentenced to twenty years, with all but fifteen years suspended, fol-

*Id.* As they were running away, Robyn and Melissa heard the sound of breaking glass. *Id.* Robyn and Melissa ran to a neighbor's house and asked him to call the police. *Id.* at 1046–47. After that, the two women returned to Donovan's house with the police to get Robyn's children, at which time they saw that Robyn's car had been damaged. *Id.* When Robyn returned to Donovan's house, he apologized and said everything would be all right, after which Robyn decided that she and her children would stay with him. *Id.* at 1045, 1047. After the police left, Donovan became angry and started hitting Robyn and pulling her hair. *Id.* Robyn told Donovan that she

heard someone at the door, and while he went to see if anyone was there, she dialed 911. *Id.* When Donovan returned and saw the phone off the hook, Robyn ran down the hallway to get away from him. *Id.* Donovan caught Robyn, kicked her, and pulled off her pants. *Id.* After ripping off her underwear, Donovan put on a condom and began having sexual intercourse with Robyn. *Id.* Robyn then heard the police at the door and screamed for them to come inside the house. *Id.* After the police entered the house, Robyn told them that Donovan had raped her. *State v. Donovan*, 2004 ME 81, ¶ 3, 853 A.2d 772, 773.

lowed by six years probation on the gross sexual assault charge. *State v. Donovan*, No. CR–94–393, 2002 Me.Super. LEXIS 242 *1, 2002 WL 32068362 (Me.Super.Ct, Ken.Cty., Nov. 20, 2002). Donovan subsequently appealed his convictions to the Maine Supreme Judicial Court on various grounds unrelated to the DNA issues at hand. *State v. Donovan*, 1997 ME 181, ¶ 2, 698 A.2d at 1045–1046. The Maine Supreme Court affirmed Donovan's criminal convictions in all respects. *Id.* Donovan also filed a motion to preserve evidence that the Superior Court granted. *State v. Donovan*, 2004 ME 81, ¶ 8, 853 A.2d at 774.

### Post Trial Motions

In 2002, Donovan filed a post-conviction motion for DNA analysis in which he sought to have several pieces of evidence analyzed. *Id.* In addition to again denying that he had sexual intercourse with Robyn on the morning of June 22, 1994, Donovan argued that Robyn had consensual sexual intercourse with another man between her first and second visits to the hospital on June 22, 1994, and that the other man was responsible for the semen found on the swab. *Id.* The Superior Court denied Donovan's motion and granted the State's motion to dismiss pursuant to Maine's newest post-conviction DNA analysis statute, 15 M.R.S. §§ 2136–2138 (2003). *Id.* The Superior Court concluded that Donovan had presented *prima facie* proof that the evidence he sought to have analyzed was, pursuant to Section 2138(4)(A), material to his identity as the perpetrator of the gross sexual assault against Robyn. *Id.* However, the Superior Court further concluded that Donovan failed to present *prima facie* proof that, pursuant to Section 2138(4)(E), identity was at issue during Donovan's criminal trial. *Id.* at 772, 774–75. On appeal, the Maine Supreme Judicial Court noted that it was interpreting

the meaning of 15 M.R.S. §§ 2136–2138 for the first time. *Id.* at 772, 775. For purposes of meeting the requirements set forth in the post-conviction DNA statute, the Supreme Court concluded that identity was always at issue in a criminal trial unless the defendant admitted to having engaged in the alleged criminal conduct and relied on a defense such as consent or justification. *Id.* at 772, 776. Consequently, the Supreme Court vacated the Kennebec Superior Court's Order and remanded Donovan's case for further proceedings consistent with its Opinion. *Id.*

### The DNA Evidence

On or about January 24, 2005, Stephen Shargo examined the vaginal swab taken from Robyn Reed that Allison Gingrass testified about at Donovan's criminal trial. (DSMF ¶ 52.) Gingrass had found *both* blood and semen on the swab, but Shargo found no semen on the remains of the swab. (*Id.* ¶ 53.) Shargo explained that he did not find semen on the remains of the swab because the sample that Gingrass tested was no longer available. (*Id.* ¶ 54.) Shargo explained that it was "not unusual to test different portions of a gauze pad and obtain different results," and that "the [original] examiner usually chooses 'the best' source to cut for the analysis." (*Id.* ¶ 55 (citing Shargo Aff. ¶ 3).) Donovan filed a motion for post-conviction review predicated on the results of Shargo's DNA testing of the swab, arguing that it was "newly discovered evidence that testimony at his trial was false or erroneous." (*Id.* ¶ 56.) Defendant Paul Rucha, in his capacity as Kennebec County Assistant District Attorney, filed the State's motion to dismiss the petition for post conviction review. (Compl. ¶ 32.) Justice Mills rejected Donovan's argument, noting that Allison Gingrass was unable to determine whether the semen and blood on the swab were Donovan's. (DSMF ¶ 57.) Citing 15

M.R.S. § 2125, Justice Mills concluded that the record evidence in Donovan's case failed to show, under any standard, that his criminal conviction was unlawful. (*Id.* ¶ 58.) Mills also concluded that the record evidence "would not have resulted in a different verdict" and so denied Donovan's petition for post-conviction relief. (*Id.* ¶ 59.)

Thereafter, Donovan filed a second motion for DNA testing. (*Id.* ¶ 60.) Justice Mills denied it on the ground that "no sufficient basis ha[d] been provided to justify a second testing." (*Id.*) Donovan unsuccessfully moved for reconsideration of Mills' Order and, assisted by counsel, argued that the Kennebec County Superior Court erred when it denied Donovan's request for a new trial pursuant to 15 M.R.S. §§ 2136–2138. (*Id.* ¶ 61–62.) Donovan asserted that he was entitled to a hearing under 15 M.R.S. § 2138(8)(B), which provides:

> If the results of the DNA analysis show that the person is not the source of the evidence and the person does not have counsel, the court shall appoint counsel if the court finds the person is indigent. *The court shall then hold a hearing pursuant to subsection 10.*

(*Id.* ¶ 63 (emphasis added).) Donovan reasoned that pursuant to 15 M.R.S. § 2138(8)(B) "a person shown not to be the source of the DNA evidence . . . is entitled to a hearing on whether or not he or she is entitled to a new trial." (*Id.* ¶ 64.) In support of his request for a hearing under Section 2138(8)(B), Donovan contended that "the complete lack of any DNA on the gauze pad does establish that he was not the source of the evidence that was used against him at trial and that this meets the definition and purpose of the statute." (*Id.* ¶ 65.) Donovan's Memorandum acknowledged that "questions persist with regard to whether Petitioner meets the

requirements of [Section 2138](8)(B) as to whether the DNA results in this case 'show that he is not the source of the evidence.'" (*Id.* ¶ 66.) The Maine Supreme Court ruled that Donovan's contention that the Superior Court erred or exceeded its discretion by failing to grant him an evidentiary hearing was "without merit." (*Id.* ¶ 67.) Accordingly, it held that "no further hearing or other action [was] necessary to a fair disposition of the matter." (*Id.* ¶ 68.)

### Discussion

Plaintiff Donovan alleges that the three defendants, Alan Kelley, Paul Rucha, and Evert Fowle, deprived him of his constitutional rights in violation of 42 U.S.C. § 1983. (Compl. at 1.) Defendants move for summary judgment on several grounds, including that Donovan's claims are barred by the *Rooker–Feldman* doctrine, and that their prosecutorial duties grant them immunity. (Mot. for Summ. J. at 13.) I will address these two issues in turn.

### A. Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might

reasonably be drawn from the facts without resort to speculation. *P.R. Elec. Power Auth. v. Action Refund,* 515 F.3d 57, 62 (1st Cir.2008). If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trialworthy controversy and summary judgment must be denied. *Azimi v. Jordan's Meats, Inc.,* 456 F.3d 228, 241 (1st Cir. 2006).

### B. *Rooker–Feldman*

◼ Defendants move for summary judgment on the ground that the *Rooker–Feldman* doctrine bars Donovan's Section 1983 claims. (Mot. for Summ. J. at 7–10.) The doctrine, which holds that lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments, prevents plaintiffs in federal court from collaterally attacking state court decisions. *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 486–87, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 415–16, 44 S.Ct. 149, 68 L.Ed. 362 (1923). Because only the United States Supreme Court may hear direct appeals from state court decisions, federal district courts must decline jurisdiction when presented with "state-court losers complaining of injuries caused by state-court judgments ... and inviting district court review and rejection of those judgments." *Lance v. Dennis,* 546 U.S. 459, 464, 126 S.Ct. 1198, 163 L.Ed.2d 1059 (2006) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005)). Historically, the lower federal courts incorporated that bar as extending to those claims "inextricably intertwined" with the claims adjudicated in the state court action. *Sheehan v. Marr,* 207 F.3d 35, 40 (1st Cir.2000). A federal claim is inextricably intertwined with the state court claims "if the federal claim succeeds only to the extent that the .state court wrongly decided the issues before it." *Id.*

◼ In *Exxon Mobil* the Supreme Court significantly narrowed the lower courts' application of *Rooker–Feldman,* limiting the doctrine to the kinds of cases from which it derived. 544 U.S. at 284, 125 S.Ct. 1517; *Davison v. Gov't of P.R.— P.R. Firefighters Corps.,* 471 F.3d 220, 222 (1st Cir.2006). The Court warned that lower courts have at times extended the doctrine "far beyond the contours of the *Rooker* and *Feldman* cases, overriding Congress' conferral of federal court jurisdiction concurrent with jurisdiction exercised by state courts...." *Exxon Mobil,* 544 U.S. at 283, 125 S.Ct. 1517. In the wake of *Exxon Mobil,* lower courts may only rely on *Rooker–Feldman* to dismiss a case if the federal plaintiff seeks to redress an injury *caused by* an allegedly erroneous state court judgment and invites the district court to review and reject that judgment. *Id.* at 284, 125 S.Ct. 1517; *Davison,* 471 F.3d at 222. If the federal plaintiff alleges a constitutional violation independent of the injury caused by the state court judgment, the doctrine does not bar jurisdiction. *Exxon Mobil,* 544 U.S. at 284, 125 S.Ct. 1517; *Todd v. Weltman, Weinberg & Reis Co.,* 434 F.3d 432, 437 (6th Cir.2006) (reiterating that *Rooker–Feldman* does not apply when the plaintiff complains of a wrong independent of injuries caused by a related state court judgment); *Washington v. Wilmore,* 407 F.3d 274, 280 (4th Cir.2005) (holding that *Rooker–Feldman* does not apply when the plaintiff's "injury rests not on the state court judgment itself but rather on the alleged violation of his constitutional rights by [the defendant]").

*Rooker–Feldman* thus precludes jurisdiction only if 1) Donovan's case is brought by a state court loser; 2) the state court

judgment was rendered before the district court proceedings commenced; 3) the alleged injury was caused by the state court judgment; and 4) the federal case invites district court review and rejection of the state court judgment. *Exxon,* 544 U.S. at 284, 125 S.Ct. 1517. I find that the first two criteria are met, but am not convinced that the injuries alleged were caused by the state court judgment itself, or that every possible characterization of the present federal claim necessarily invites review and rejection of the state court judgment.

■ Donovan alleges violations of his constitutional rights in three forms, namely the defendants' alleged refusal to "allow" him an evidentiary hearing to prove his innocence based on DNA test results,[3] their attempts to conceal exculpatory evidence, and their reliance on "false" testimony by Forensic Chemist Allison Gingrass. (Compl. at 1.) Donovan asserts that he suffered a variety of injuries to his constitutionally protected civil rights as a result of this "pattern of violations." (*Id.* at 8–14.)

Donovan complains that the defendants' actions deprived him of his civil rights, prevented him from proving his innocence, and resulted in his registration as a sex offender. (Compl. ¶¶ 45–72.) The First Circuit has held that a federal claim is inextricably intertwined with a state judgment "if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." *Sheehan,* 207 F.3d at 40. A reading of Donovan's complaint suggests that it is inextricably intertwined with the merits of his post-trial motion for DNA analysis, which is itself a challenge to the merits of his conviction.

However, the "inextricably intertwined" approach to *Rooker–Feldman* predates the Supreme Court's significant narrowing of the doctrine in *Exxon Mobil.*[4] 544 U.S. at 284, 125 S.Ct. 1517. In *Exxon Mobil,* the Court noted that in the years since *Feldman* it had never applied the doctrine to dismiss an action for want of jurisdiction and held that if the federal plaintiff alleges a constitutional violation independent of the injury caused by the state court judgment, the doctrine does not bar jurisdiction. *Id.* at 284, 287, 125 S.Ct. 1517.

Viewing *Rooker–Feldman* through this considerably narrowed perspective, Donovan's alleged injuries exist independent of the state court judgment. The Fourth Circuit held that *Rooker–Feldman* does not apply where the plaintiff "challenge[d] not his conviction but rather one aspect of the means by which that conviction was achieved."[5] *Washington v. Wilmore,* 407

---

**3.** Donovan complains of the defendants' "continued refusal to allow him an evidentiary hearing or the chance to exercise his right to demonstrate his actual innocence based on his Forensic and DNA test results...." (Compl. at 1.) Obviously, the defendants in their roles as prosecutors had no power to grant or allow Donovan a hearing—that was the responsibility of Justice Mills. Donovan likely means to complain of the defendants' advocacy against his efforts to secure a hearing.

**4.** *Exxon Mobil* did not explicitly void the "inextricably intertwined" language, but given the strict standard it set forth for applying

*Rooker–Feldman,* commentators have inquired into the continued viability of "inextricably intertwined." *See* Allison B. Jones, note, *The* Rooker–Feldman *Doctrine: What Does It Mean To Be Inextricably Intertwined?,* 56 Duke L.J. 643 (2006).

**5.** The court in *Washington* looked in particular to *Jordahl v. Democratic Party of Va.,* which distinguished between actions "seeking review of the state court decisions themselves and those cases challenging the constitutionality of the process by which the state court decisions result." 122 F.3d 192, 202 (4th Cir.1997).

F.3d at 280. As in *Washington,* Donovan's "claim of injury rests not on the state court judgment itself, but rather on the alleged violation of his constitutional rights by [the defendants]." *Id.* Donovan alleges that the defendants' actions (denying him a hearing, relying on "false" testimony, and concealing evidence), not the state court judgment, violated his civil rights. (Compl. at 1, 8–12.)

Donovan has not brought suit in an effort to directly review or reverse the state court judgment against him. (Compl. at 1.) He seeks damages in connection with alleged prosecutorial misconduct and violations of his civil rights, including concealment of exculpatory evidence and reliance on "false" testimony. The Civil Rights Act affords subject matter jurisdiction over Donovan's claims and the *Rooker–Feldman* doctrine does not clearly bar exercise of that jurisdiction. Therefore, I conclude that this court has subject matter jurisdiction and should decide this case on the merits.

## C. Prosecutorial Immunity

Donovan alleges civil rights violations pursuant to 42 U.S.C. § 1983, which provides that "[e]very person" who acts under color of state law to deprive another of a constitutional right shall be answerable to that person in a suit for damages. (Compl. at 1.) While on its face the statute appears to create no immunities to liability, a literal reading of the statute has never prevailed. *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). In *Imbler,* the Court held that the common-law immunity of a prosecutor is "based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties," including concerns that harassment by unfounded litigation would distract the prosecutor from his

public duties and "shade his decisions." *Id.* at 422–23, 96 S.Ct. 984. In the absence of *absolute* immunity for prosecutorial conduct, the Court reasoned, "apprehension" of possible civil suits would "weaken the fearless and impartial policy which should characterize the administration of this office." *Id.* at 423, 96 S.Ct. 984 (quoting *Pearson v. Reed,* 6 Cal.App.2d 277, 287, 44 P.2d 592 (1935)). Thus, permitting civil claims would impose "unique and intolerable burdens" upon the prosecutor personally and the criminal justice system generally. *Id.* at 425, 96 S.Ct. 984. While the Court acknowledged that such a blanket rule adopting absolute prosecutorial immunity would "leave the genuinely wronged defendant without civil redress," it reasoned nonetheless that the "broader public interest" was best served by the "vigorous and fearless" performance of the prosecutor's duty, and furthermore that criminal sanctions and professional discipline still serve as "checks" upon the prosecutor's power. *Id.* at 427, 429, 96 S.Ct. 984.

 Not all prosecutorial conduct warrants absolute immunity. Absolute immunity only applies to prosecutorial actions that are "intimately associated with the judicial phase of the criminal process." *Van de Kamp v. Goldstein,* 555 U.S. 335, 129 S.Ct. 855, 860, 172 L.Ed.2d 706 (2009) (quoting *Imbler,* 424 U.S. at 430, 96 S.Ct. 984). In determining which prosecutorial activities merit immunity, the reviewing court looks to "the nature of the function performed, not the identity of the actor who performed it." *Forrester v. White,* 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). According to this "functional test," a prosecutor receives absolute immunity only when performing his function as an "advocate," "act[ing] within the scope of his duties in initiating and pursuing a criminal prosecution." *Imbler,* 424 U.S. at 410, 96 S.Ct. 984. By compari-

son, he receives only partial immunity when acting "in the role of an administrator or investigative officer." *Id.* at 430–32, 96 S.Ct. 984. In the years since *Imbler,* the Supreme Court has held that absolute immunity applies when a prosecutor files criminal charges, *id.* at 409, 96 S.Ct. 984, prepares to initiate a judicial proceeding, *Burns v. Reed,* 500 U.S. 478, 492, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), advocates at a preliminary hearing, *id.* at 478, 111 S.Ct. 1934, or appears in court to present evidence in support of a search warrant application, *Kalina v. Fletcher,* 522 U.S. 118, 126, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997), but not when a prosecutor gives advice to police during a criminal investigation, *Burns,* 500 U.S. at 496, 111 S.Ct. 1934, makes statements to the press, *Buckley v. Fitzsimmons,* 509 U.S. 259, 277, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993), or acts as a complaining witness in support of a warrant application, *Kalina,* 522 U.S. at 132, 118 S.Ct. 502.

Thus, to be entitled to summary judgment the defendants must show that there is no genuine issue of material fact that the alleged Section 1983 violations occurred while they were acting as "advocates" and "officers of the court," and performing prosecutorial duties "intimately associated with the judicial phase of the criminal process." *Van de Kamp,* 129 S.Ct. at 861 (quoting *Imbler,* 424 U.S. at 430–31, 96 S.Ct. 984). In particular, Donovan alleges three violations of his constitutional rights. In each case, I find that the duties in question were performed pursuant to the prosecutors' roles as "advocates."

■ First, Donovan alleges the defendants' "continued refusal to allow him an evidentiary hearing or the chance to exercise his right to demonstrate his actual innocence based on his Forensic and DNA test results." (Compl. at 1.) Even if true,

under the "functional test" the defendants' "refusal" to allow Donovan an evidentiary hearing occurred pursuant to their duties as "advocates," as it was part of "initiating a prosecution [or] in presenting a State's case." *Imbler,* 424 U.S. at 410, 430, 96 S.Ct. 984. There is no evidence that these actions by the defendants occurred in the context of "administrat[ive]" or "investigative" prosecutorial activities. Rather, arguing in opposition to a request for an evidentiary hearing fits the definition of "advocacy" neatly, as it necessarily involves arguing the State's case before the court.

■ The same can be said for Donovan's second allegation, that defendants "attempted to delay and/or conceal highly exculpatory evidence." (Compl. at 1.) Courts have spoken specifically to this issue, holding that absolute prosecutorial immunity encompasses bad faith withholding of evidence. *Campbell v. Maine,* 787 F.2d 776, 777 (1st Cir.1986) ("*Imbler* rejected a suggestion that the prosecutor's immunity be reduced to a qualified one when he is alleged to have withheld exculpatory information.").

Donovan's third allegation is "the ongoing facilitation of, and reliance on false testimony by former Forensic Chemist Allison Gingrass." (Compl. at 1.) Again, even assuming this allegation is true, any reliance on Gingrass's testimony was well within the borders of what could be considered the "advocate" functions of a prosecutor, as this reliance was for the express purpose of "presenting [the] State's case" at trial. *Imbler,* 424 U.S. at 430, 96 S.Ct. 984.

Finally, Donovan disputes the defendants' defense of prosecutorial immunity by asserting that "[d]efendants cannot claim their actions were within the scope of their official duty," and providing a list of their alleged misdeeds, including con-

cealing evidence and misleading the court. (Opp'n. to Mot. for Summ. J. at 17.) Donovan appears to be asserting, in essence, that immunity does not apply because proper prosecutorial conduct would preclude such civil rights violations. It is certainly true that the defendants' official duties do not include depriving individuals of their constitutional rights. But even assuming that the alleged misdeeds did occur, it would not necessarily mean that the defendants were not acting as "officers of the court" when they allegedly violated Donovan's rights. *Imbler,* 424 U.S. at 430, 96 S.Ct. 984. Donovan must show that at the time of the alleged violations the defendants were performing duties unrelated to the "judicial phase of the criminal process," such as administrative or investigative tasks, and he simply does not provide facts which show that the violations occurred at a time *other than* when the defendants were "initiating a prosecution or presenting a state's case." *Id.; Campbell,* 787 F.2d at 777. On the contrary, the allegations all concern conduct occurring while the defendants were performing their duties as prosecutors and officers of the court. *Imbler,* 424 U.S. at 430, 96 S.Ct. 984.

Donovan states that his suit is brought against the defendants in their individual capacity, seemingly suggesting that an action brought against them as individuals somehow escapes the shield of prosecutorial immunity. However "a § 1983 action brought ... for damages against prosecutors in their individual capacity would ... be barred by the doctrine of prosecutorial immunity." *Willhauck v. Halpin,* 953 F.2d 689, 711 (1st Cir.1991). Donovan must present facts showing that the defendants' actions were performed in other than their quasi-judicial capacity, *Van de Kamp,* 129 S.Ct. at 861. He fails to do so and judgment should accordingly enter for the defendants.

## CONCLUSION

Based on the foregoing, I recommend that the defendants' motion for summary judgment be GRANTED with respect to their defense of prosecutorial immunity.